EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
JOAN KILLEEN
Deputy Attorney General
State Bar No. 111679
   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
   Telephone: (415) 703-5968
   Fax: (415) 703-1234
   Email: Joan.Killeen@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **EDMOND BELONEY,** | C 07-4327 WHA (PR) |
| Petitioner, | |
| v. | |
| **ANTHONY HEDGPETH, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**

1g    EDMUND G. BROWN JR.
       Attorney General of the State of California
2     DANE R. GILLETTE
       Chief Assistant Attorney General
3     GERALD A. ENGLER
       Senior Assistant Attorney General
4     PEGGY S. RUFFRA
       Supervising Deputy Attorney General
5     JOAN KILLEEN
       Deputy Attorney General
6     State Bar No. 111679
        455 Golden Gate Avenue, Suite 11000
7       San Francisco, CA 94102-7004
        Telephone: (415) 703-5968
8       Fax: (415) 703-1234
        Email: Joan.Killeen@doj.ca.gov
9     Attorneys for Respondent

10                   IN THE UNITED STATES DISTRICT COURT

11               FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13

      **EDMOND BELONEY,**                          C 07-4327 WHA (PR)
14
                                     Petitioner,   **MEMORANDUM OF POINTS**
15                                                 **AND AUTHORITIES IN**
                                                   **SUPPORT OF ANSWER TO**
            **v.**                                 **PETITION FOR WRIT OF**
16                                                 **HABEAS CORPUS**
      **ANTHONY HEDGPETH, Warden,**
17
                                     Respondent.
18

19          In its Order to Show Cause, this Court identified petitioner's grounds for federal habeas

20    relief as follows: "(1) there was insufficient evidence to support the gang enhancement; (2) his

21    sentence was cruel and unusual; and (3) his Fifth, Sixth, and Fourteenth Amendment rights were

22    violated when the trial court gave a defective jury instruction." 8/28/07 Order to Show Cause at 2.

23    Because the state court reasonably rejected petitioner's claims, he is not entitled to relief.

24                               **STATEMENT OF THE CASE**

25          On January 21, 2005, the Santa Clara County District Attorney filed an information

26    charging Edwin Beloney, Edmond Beloney, and Avery Darbey with two counts of first degree

27    residential robbery while acting in concert, Cal. Penal Code § 213(a)(1)(A), and alleging the crimes

28

      Memorandum Of Points And Authorties In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
      WHA (PR)

                                                    1

1 were committed for the benefit of, at the direction of, or in association with a criminal street gang,

2 with the specific intent to promote, further, or assist in any criminal conduct by gang members, Cal.

3 Penal Code § 186.22 (b)(4). Exh. A [hereafter "CT"] 180-183. On June 15, 2005, a jury convicted

4 the defendants as charged and found the gang allegations to be true. CT 531-548. On September 9,

5 2005, the court sentenced each of the defendants to 15 years to life on each count, to run

6 concurrently. CT 710-718.

7      On December 28, 2006, the Court of Appeal affirmed petitioner's judgment on appeal.

8 Exh. H. On April 11, 2007, the California Supreme Court denied review. Exh. K.

9      Petitioner filed his federal habeas corpus petition on August 22, 2007. His petition is

10 timely. 28 U.S.C. § 2244(d)(1); *Bowen v. Roe*, 188 F.3d 1157 (9th Cir. 1999).

11 **STATEMENT OF FACTS**

12      About 5:30 a.m. on March 22, 2004, Carrie Riddell was asleep in her San Jose apartment

13 when she was awakened by a loud bang. Two men ran into her bedroom, one of whom punched her

14 in the stomach as she started to get up. When she fell to her knees, he grabbed her by the hair and

15 threw her onto the bed. She heard the sounds of someone punching her boyfriend, Gary Newell.

16 Exh. B [hereafter "RT"] 559-561, 565. Someone repeatedly asked, "Where is all the money," and

17 "Where is all the weed." RT 590-591.[1] Newell broke free and ran into the living room. When the

18 men, who by then numbered three, asked where everything was, Newell said all they had was

19 Riddell's car. Riddell gave them her keys, hoping they would leave.[2] She and Newell could not

20 escape because one of the men was standing at the door with a machete, which Newell had

21 purchased about two months earlier. After taking the keys, two of the men ran from the apartment.

22 A third man, who had been hitting Newell in the face with a speaker, punched Riddell in the face

23 

24     1. Riddell thought they might have been looking for marijuana because Newell, who had

25 a prescription for medical marijuana, was known to keep the drug in the house. RT 566, 644. There was enough marijuana for one person in a bowl on the table. They also had $800 in rent money, which she did not think they took. RT 591-592, 602.

26 

27     2. Riddell later said Newell also falsely told the robbers the marijuana was in the trunk of her car, so she gave them her keys to open it. She thought both of them were simply trying to get the robbers out of the house. RT 594, 597, 602-603.

28 

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327 WHA (PR)

1g  before leaving.  RT 565-566, 572, 592, 604-605.

2       Riddell identified the men as Avery Darbey ("C") and twins Edmond Beloney ("Little

3  Man") and Edwin Beloney ("Fats").  A few years earlier, she and Newell had been friends with

4  Edmond, who said he was a member of the Seven Trees Crips gang.  The Beloney brothers attacked

5  Riddell and Newell in their bedroom.  Edwin, who was wearing a blue Pendleton shirt, gave Riddell

6  a black eye before leaving.  Darbey was holding the machete.  The men took Riddell's car keys, the

7  machete, and an ax from the apartment.  They had broken down the front door to get in.  RT 562-

8  568, 572, 584-585, 598, 616-617, 662.  Not long after the robbery, Riddell identified Darbey and

9  Edmond, whom the police had stopped.  The police found her keys on the suspects.  RT 588-589.

10  Neither Riddell nor Newell were gang members.  RT 590.

11       At one point Riddell said she feared retaliation from the Seven Trees Crips.  RT 600-601.

12  She also said she did not think of the gang that night.  RT 606.  She had not heard any of the robbers

13  yell gang slogans or threaten retaliation.  RT 599.

14       Newell recalled being hit in the face with a flower pot while he was still in bed that

15  morning.  He also recalled being hit with a speaker and a machete.  He thought all three men

16  attacked him.  They were asking for his money and marijuana, which he said was in the car.  At the

17  time, he was smoking a lot of marijuana.  He also took phenobarbital for seizures.  He kept the

18  machete behind the front door.  He could not explain why he did not recognize it at the preliminary

19  hearing, but said he had problems with his memory that were caused by his seizures.  He thought

20  he lost $875, but was not sure if it was taken in the robbery.  He sustained numerous lacerations to

21  his face and jaw.  RT 609-616, 622-628, 631-634.

22       Newell first met Darbey a few days before the robbery.  Darbey had come to his apartment

23  with a group of 10 or 12 men armed with bats, sticks, and knives.  Darbey told Newell he had a

24  problem with one of his friends.  Newell dragged Darbey into his apartment and closed the door, but

25  he did not recall what happened after that or whether he threatened Darbey.  RT 617-621, 648.[3/]  He

26

27       3.  Newell did not recall testifying at the preliminary hearing that he pulled Darbey into his
    apartment, threw him on the couch, and threatened him with a Samurai sword.  RT 646-648.
28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
WHA (PR)

1g    knew most of the men with Darbey and said they were not gang members.  RT 661, 667.  About two

2    months before the robbery, someone broke into Newell's apartment looking for guns.  He did not

3    recall telling a police officer that the person was a friend of Edmond's.  RT 623.

4           About 6:20 a.m. on the day of the robbery, Officer Woolsey helped arrest Edmond and

5    Darbey, who had been detained as suspects about one-fourth to one-half mile away.  Woolsey found

6    a pair of gloves and Riddell's keys in Edmond's pockets.  RT 742-746.

7           Officer Hamblin interviewed Newell at the hospital about 8:30 that morning.  Newell said

8    he and Riddell were each attacked by one or two men.  He also said he had been burglarized two

9    months earlier.  RT 737-738.  Regarding the culprit in the prior burglary, whom he knew, Newell

10    said, "I beat his ass."  He thought the burglar was looking for guns and said they both knew

11    Edmond.  RT 738-739.

12           Lieutenant Ryan interviewed Edwin about 9:30 that morning.  Edwin admitted that he

13    grabbed Riddell and held her down and that he participated in the robbery of Newell.  In a second

14    interview, he admitted he was a member of the Seven Trees Crips gang.  RT 710-713.  Ryan thought

15    Edwin was under the influence of methamphetamine at the time of the first interview, but that he

16    was able to understand and answer the questions asked.  Edwin admitted he was under the influence

17    and said he had been using drugs for the previous few days.  RT 717-718, 721, 725.  Ryan used the

18    term robbery when questioning Edwin, but Edwin's own words were that he went over there to

19    "fuck with the guy."  RT 718.

20           About 11:30 a.m. that day, Officer Mitchell interviewed Edmond, who also admitted

21    participating in the robbery.  Edmond said he heard a scuffle going on in the bedroom and

22    recognized Newell's and Riddell's voices.  He did not know it was Newell's apartment until they

23    got there.  Edmond took a machete from a sheath on Newell's wall, but he did not think it was used

24    on Newell; he later disposed of it.  RT 727-729.  He said he was in the apartment looking for

25    "weed."  He also said he had been a member of the Seven Trees Crips gang since the age of 16, but

26    had not done much "gang-banging" since 2000.  He described the gang tattoos he had on his arms

27    and shoulders.  RT 729.  Edmond acknowledged Seven Trees Crips was originally a criminal street

28

1g | gang, but said some of the members were also in a studio trying to "rap." RT 733-734.

2       Officer Sass sat in on the interview with Edmond and heard him acknowledge his

3 membership in Seven Trees Crips. RT 749-750. Edmond had "South" and "Side" tattooed on his

4 shoulders, "Seven" and "Trees" tattooed on the backs of his arms, the number seven tattooed in the

5 middle of his back, under which was the word "Trees," "Hundred Percent Black" tattooed on his

6 right chest, a marijuana leaf tattooed on his left chest, "408 Lil' Man" on one forearm, and "Ruthie"

7 and "408" tattooed on his left arm. RT 752. Edwin had the number seven tattooed on the back of

8 his left arm, the words "Seven Trees" tattooed on the back of his right arm, a marijuana leaf tattooed

9 on his left forearm, and the name "Ruthie" on his right forearm. RT 751. Darbey had a scar or

10 carving of the letters "BK" on his left chest. RT 753.

11       At the time of the robbery, Officer Sass was a detective in the gang investigations unit,

12 assigned to African-American, Asian, and female gangs. RT 753- 756. The San Jose Crips gangs,

13 including Seven Trees, identified with the color blue and the number 408, which referred to the local

14 area code. Sass opined that the Seven Trees Crips was an ongoing criminal organization based on

15 several recent incidents. The gang aligned with the Hispanic Norteno gangs, who were fighting the

16 Hispanic Sureno gangs. RT 774-775, 780-790.

17       The Seven Trees Crips engaged in robbery, assault with a deadly weapon, witness

18 intimidation, criminal threats, homicide, carjacking, and possession of drugs for sale. RT 794-810.

19 Sass related a 1995 incident in which Edwin and Edmond participated in the armed robbery of a man

20 whom the gang members believed had stolen guns from them. RT 799-800. She also related a

21 carjacking that Edwin, Darbey, and Thomas Hall were involved in shortly before the home invasion

22 at issue in the trial. The three men approached the two victims, who were standing outside their car,

23 forced them to their knees, robbed them while pretending to be armed, and took their car. RT 810-

24 812, 855.

25       Sass opined the current case was further evidence that one of the gang's primary activities

26 was committing crimes. Edwin and Edmond had admitted their gang membership upon arrest, the

27 defendants had gang tattoos, they committed the robbery together, and the victims were aware that

28

1  the robbers were Seven Trees Crips members and feared retaliation.  RT 812-813, 868.  She later

2  emphasized, "the victims had prior knowledge of the Seven Trees Crips membership, and feared

3  that, and mentioned it repeatedly to police during the investigation right after it happened."  RT 868.

4      Officer Sass opined that Edwin was a Seven Trees Crips gang member based on his

5  admission in this case, his tattoos, his association with other gang members, his arrests for selling

6  drugs and carrying a concealed weapon in gang territory, his participation in a gang fight in which

7  he flashed a gang sign in the presence of police officers, his participation in an armed robbery with

8  other gang members, the clothing he was wearing as documented in some of the incidents, and his

9  participation in the current case as well as the recent carjacking case.  RT 814-825.  She opined that

10  Edmond was a Seven Trees Crips gang member based on his admission in this case, his tattoos, his

11  arrests for selling drugs in gang territory, his participation in an armed robbery with other gang

12  members, his involvement in a dispute with rival gang members, his possession of cocaine while

13  with a gang member from a related gang, his wearing of gang clothing in gang territory, his

14  participation in a gang fight, and his participation in the current case.  RT 824-833, 840-843.[4]  Sass

15  opined that Darbey was a Seven Trees Crips gang member based on the scar or carving of the letters

16  "B" and "K" on his chest,[5] his wearing of gang clothing and use of gang slang to intimidate others,

17  his frequenting or loitering in gang territory and association with other gang members, his

18  commission of crimes in gang territory, including drug sales, being under the influence, assault with

19  a deadly weapon, assault of three victims who bumped into him, auto burglary, and possession of

20  a concealed weapon, his arrest for a robbery near gang territory, his admission to jail personnel in

21  a classification interview that he was a Seven Trees Crips gang member, and his participation in the

22  current case as well as the recent carjacking case.  RT 843-856.

23      Officer Sass opined that the home invasion in the current case was committed for the

24  _____

25      4.  In his police interview, Edmond said there were 70 to 80 current Seven Trees Crips members.  RT 1023, 1034.

26

27      5.  Sass explained that "BK" usually meant "Blood Killer."  "Bloods" were rivals of the Crips.  RT 844.  She testified on cross-examination that an earlier police report had described the letters as "G.K."  RT 1039-1040.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327 WHA (PR)

benefit of and in association with a criminal street gang. The crime benefitted the gang because it helped retaliate for and save face stemming from Newell's beating of Darbey in front of a group of non-gang members. It also enhanced the gang's reputation in the community and sent a message to the victims and others regarding the strength of the gang, with the added potential benefit of financial gain. The crime was committed in association with other gang members because each of the participants was a gang member. RT 856-859. At the time of the crime, Edwin wore a blue and white checkered shirt and Edmond and Darbey wore blue pants. RT 1018-1019. Sass stated that gang members do not always identify themselves when committing a crime. RT 1037.

Ruthie Dandridge, Edwin and Edmond's mother, testified that Darbey and her sons had been friends since the age of five or six and had lived in the same neighborhood and attended the same schools. She had given Edwin and Edmond the nicknames of Fats and Little Man, respectively, at the time they were born. RT 1055-1060. John King, Darbey's grandfather, had known Edmond and Edwin since they were about six years old and saw them frequently. They lived in the same apartment complex as his daughter, Gail King. RT 1076-1079.

Jamila Carter, Edmond's girlfriend and the mother of his two young children, testified that in the hours before his arrest, Edmond was with her at Dandridge's house, where they were drinking alcohol and smoking marijuana and methamphetamine. Carter, who was pregnant with their second child, was addicted to methamphetamine at the time, as was Edmond. RT 1062-1063, 1066-1067. Edwin and Darbey arrived at the residence around 1:00 or 2:00 a.m.; they were also under the influence of methamphetamine. The four of them continued to ingest drugs and alcohol until they ran out. At that point, the three men left without saying where they were going. Carter next heard from Edmond when he called her from jail and told her he was there for a home invasion. RT 1067-1069. On cross-examination, Carter said that Edmond did not get his tattoos until 2000 or later. RT 1071.

The parties stipulated that defendants' blood specimens taken upon arrest showed the presence of methamphetamine. RT 1074.

**STANDARD FOR GRANTING RELIEF**

The Court reviews the state court's rulings under a "highly deferential" standard imposed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). The federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an "unreasonable application" of Supreme Court law if the state court's application of law to the facts is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's ruling based on a factual determination also must be "'objectively unreasonable' in light of the record" to warrant habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); 28 U.S.C. § 2254(d)(2). The petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25. Even if a constitutional error occurred, habeas relief is available only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, ___ U.S. ___, 127 S.Ct. 2321, 2325, 2328 (2007), internal quotation marks omitted; *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

**ARGUMENT**

**I.**

**THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE GANG ENHANCEMENT**

Petitioner contends there was insufficient evidence to support the jury's finding that the home invasion robbery was committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members" Cal. Penal Code § 186.22(b)(4). The state court reasonably rejected his claim.

**A.    State Court Of Appeal's Ruling**

The state court of appeal rejected petitioner's claim as follows:

> Edmond and Avery separately contend that the evidence was insufficient to support the criminal street gang enhancements. Edmond argues that Officer Sass's testimony does

not constitute substantial evidence to establish that the robberies were committed for the benefit of, or in association with, a criminal street gang, or that they were committed with the specific intent to promote, further, or assist in criminal conduct by gang members. Avery argues that there was insufficient evidence that he "had the specific intent to benefit any gang member in commission of a criminal act other than the robbery in question." Edwin joins in both Edmond's and Avery's arguments.

The same standard of review applies to claims of insufficiency of the evidence to support a gang enhancement finding as for a conviction. [Citations.] "A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" [Citation.] "'A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence."'" [Citation.]" [Citation.]

"This standard applies whether direct or circumstantial evidence is involved." [Citation.] The element of intent is generally proved with circumstantial evidence. "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. [Citations.]" [Citation.] Evidence to support the element of specific intent may be shown by a defendant's conduct, including any words the defendant may have spoken, and by all the circumstances surrounding the commission of the acts. [Citations.]

Section 186.22, subdivision (b)(4) imposes punishment of life imprisonment with a minimum term of 15 years when a defendant is convicted of "a home invasion robbery" in violation of section 213, subdivision (a)(1)(A), "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).) The essential elements of an allegation under this subdivision are: (1) the crimes charged, in this case home invasion robberies, were committed for the benefit of, at the direction of, or in association with a criminal street gang; and (2) these crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members. [Citation.] The jury was so instructed. (See CALJIC No. 17.24.2; see also, CALCRIM No. 1401.) Defendants Edwin and Edmond contend that the prosecution failed to establish either one of these essential elements. Avery contends that the prosecution failed to establish only the latter element.

The record discloses that Carter testified that Edwin, Edmond, and Avery left Edmond's mother's home together in the early morning hours of March 22, 2004. Both Edwin and Edmond admitted being involved in an incident at Newell and Riddell's apartment the morning of March 22, 2004. Edwin told officers that he went there to "fuck with the guy," and Edmond said that he was looking for "weed." Newell and Riddell testified that Edwin, Edmond, and Avery all participated in a home invasion robbery at their apartment on the morning of March 22, 2004. Edmond admitted taking a machete from the apartment and Riddell's keys were found in Edmond's pocket shortly after the incident. None of the defendants contest the sufficiency of this evidence to support the jury's finding that the three defendants committed a home invasion robbery at Newell and Riddell's apartment on the morning of March 22, 2004.

The record further discloses that Newell and Riddell used to hang out with Edmond, but Edmond had never been to Newell and Riddell's apartment before he participated in the robberies. Newell and Riddell knew Edwin only through Edmond. However, Newell testified that a few days before the home invasion robbery Avery came to his apartment door, and that Newell had grabbed Avery and dragged him inside. The jury also heard evidence that Newell had then beaten Avery up in front of others and had told him not to return or there would be problems. Both Newell and Riddell testified that Edmond told them that he was a member of Seven Trees Crips, both Edmond and Edwin admitted to officers after the robberies that they were members of Seven Trees Crips, and Officer Sass testified as a gang expert that in her opinion Edmond, Edwin, and Avery were all members of the Seven Trees Crips gang. Sass also testified that in her opinion Seven Trees Crips is an ongoing criminal street gang and she explained the bases for her opinion. Sass testified about other offenses that Seven Trees Crips members, including each of the defendants, had committed that she considered gang-related and she testified as to the bases of her opinions. Sass testified that in her opinion the robberies of Newell and Riddell were gang-related due to the admissions of membership in Seven Trees to Officer Mitchell and Lieutenant Ryan, the defendants' gang tattoos, the participation by three gang members in the robberies, the fact that the victims knew the robbers to be Seven Trees Crips gang members and specifically reported the robberies as having been committed by Seven Trees Crips gang members, and the fact that the robberies occurred shortly after Newell had beaten up Avery in front of some friends. Further, Sass testified that retaliating against a person who disrespected a Seven Trees Crips gang member would benefit the Seven Trees gang because it "send[s] a message to people that Seven Trees is not to be messed with, it helps them build their power and later to help in recruiting."

We conclude that this is sufficient evidence to support the section 186.22, subdivision (b)(4) element that the home invasion robberies in this case were "committed for the benefit of, at the direction of, or in association with any criminal street gang." We also conclude that this is sufficient evidence to support the section 186.22, subdivision (b)(4) element that the offenses were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." In our limited role of evaluating a sufficiency-of-the-evidence claim, we do not reweigh the evidence, redetermine issues of credibility, or second-guess whether we would have reached a conclusion different from the trier of fact. [Citation.] Thus, as another appellate court reasoned in rejecting a similar challenge to a gang enhancement finding: "Here a qualified expert testified the participation of a Southside gang member in a Townsend Street retaliation killing would benefit Southside by enhancing its 'respect.' It was for the jury to assess the weight of that testimony in the first instance, and since we believe a 'rational juror' could have been convinced by it, we cannot deem it insufficient." [Citation.] We find substantial evidence supports the jury's findings that all three defendants committed the home invasion robberies for the benefit of, or in association with, a criminal street gang.

Exh. H at 12-16.

## B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence

1 | g  in the light most favorable to the prosecution, any rational trier of fact could have found the essential

2  elements of the crime beyond a reasonable doubt.'" *Id*. (quoting *Jackson v. Virginia*, 443 U.S. 307,

3  319 (1979)).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable

4  doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.  On habeas

5  review, a federal court evaluating the evidence should take into consideration all of the evidence

6  presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006).  If confronted by a record

7  that supports conflicting inferences, a federal habeas court "must presume—even if it does not

8  affirmatively appear on the record—that the trier of fact resolved any such conflicts in favor of the

9  prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.  Circumstantial evidence

10  and inferences drawn from that evidence may be sufficient to support a conviction, but mere

11  suspicion and speculation cannot support logical inferences. *Walters v. Maass*, 45 F.3d 1355, 1358

12  (9th Cir. 1995).

13  After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional

14  layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal

15  habeas court must ask whether the operative state court decision reflected an unreasonable

16  application of *Jackson* to the facts of the case. *Id*. at 1275.  That is, the state court's application of

17  the *Jackson* standard must be "'objectively unreasonable.'" *Id*. at 1275 n.13 (quoting *Williams v.*

18  *Taylor*, 529 U.S. 362, 409 (2000)).

19  Here, the state court reasonably rejected petitioner's claim.  As the state court observed,

20  petitioner admitted his participation in the underlying crime. He also admitted that he was a member

21  of Seven Trees Crips, and had numerous gang-related tattoos. Other evidence showed that petitioner

22  had an extensive criminal history in connection with his gang involvement.  He committed the home

23  invasion robberies with two other gang members.  One of them, Avery, had recently had an

24  altercation with Newell, one of the victims, in which he was "disrespected" in front of a large group,

25  thus calling for retaliation.  Both victims knew petitioner and his companions were members of

26  Seven Trees Crips.  They reported the crimes as having been committed by Seven Trees gang

27  members.  They also repeatedly expressed their fear of retaliation to the police immediately after

28

1g the robberies.

2       Officer Sass testified as an expert on gangs.  She opined that the crimes would benefit the

3 gang because they served as retaliation and saving face for the beating that Avery suffered at

4 Newell's hands a few days before.  Further, the crimes enhanced the gang's reputation in the

5 community and sent a message to the victims and others regarding the strength of the gang.  Sass

6 also opined that the crimes were committed in association with other gang members because all of

7 the perpetrators were gang members.  Also, each of them wore gang colors at the time of the crimes.

8 Thus, the evidence showed that the crimes were committed for the benefit of, at the direction of, or

9 in association with a criminal street gang.

10       The evidence also showed petitioner committed the crimes with the specific intent to

11 promote, further, or assist in any criminal conduct by gang members.  He admitted his active

12 participation in the crimes, and was caught with crime proceeds shortly afterward.  Both of his

13 companions were gang members, and all three assisted each other in perpetrating the crimes.  The

14 crimes also had the effect of promoting the gang, a fact of which petitioner was surely aware, having

15 previously been friends with the victims and informing them of his gang membership.  As noted, the

16 victims reported the crimes as having been committed by Seven Trees Crips members, and

17 expressed their fear of retaliation to the police.  Accordingly, the evidence was more than sufficient

18 to support the second element of the gang enhancement statute.

19       In state court, petitioner argued that *Garcia v. Carey*, 395 F.3d 1099 (9th Cir. 2005),

20 supported his claim with respect to the second element of the gang enhancement.  In that case, the

21 court granted habeas corpus relief to a California prisoner after finding the evidence was insufficient

22 to support the gang allegation because there was no evidence the defendant committed the robbery

23 in order to facilitate *other* gang-related criminal conduct.  *Id*. at 1103-1104.

24       Judge Wallace's dissenting opinion in *Garcia* disputed the majority opinion's

25 interpretation of California law.  "But section 186.22(b)(1) does not require proof that the crime of

26 conviction was committed with the intent to further some other specifically identified crime or

27 category of crimes, and California courts have rejected sufficiency of the evidence claims even

28

1   where such evidence was entirely lacking.  [Citations.]"  *Garcia v. Carey*, 395 F.3d at 1105

2   (Wallace, J., dissenting).

3           Like Judge Wallace, the Court of Appeal in *People v. Romero*, 140 Cal.App.4th 15 (2006),

4   found the *Garcia* analysis unpersuasive.

> In *Garcia*, the Ninth Circuit found insufficient evidence of specific intent to promote,
> further, or assist in *other* criminal conduct by the defendant's gang.  We disagree with
> *Garcia*'s interpretation of the California statute, and decline to follow it.  (See *People v.
> Burnett* (2003) 110 Cal.App.4th 868, 882, 2 Cal.Rptr.3d 120 [federal authority is not
> binding in matters involving state law]; see also *Oxborrow v. Eikenberry* (9th Cir. 1989)
> 877 F.2d 1395, 1399 [state court interpretation of state statute binding on federal court
> unless interpretation is a subterfuge or untenable].)  By its plain language, the statute
> requires a showing of specific intent to promote, further, or assist in "*any* criminal conduct
> by gang members," rather than *other* criminal conduct.  (§ 186.22, subd. (b)(1), italics
> added.)

11  *People v. Romero,* 140 Cal.App.4th at 19; *see also People v. Gardeley*, 14 Cal.4th 605, 621-622

12  (1996) (prosecution need not prove that predicate offenses used to establish pattern of gang activity

13  were gang related).[6]  As the state court of appeal noted in *Romero*, federal courts are bound by state

14  court interpretations of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Wainwright v.*

15  *Goode*, 464 U.S. 78, 84 (1983) (per curiam).  Accordingly, the state court's rejection of a contrary

16  interpretation of the state statute by a lower federal court was not objectively unreasonable.

17          As the state court of appeal found, ample evidence supports the jury's finding on the gang

18  enhancement allegation.  Accordingly, petitioner's claim of insufficient evidence should be rejected.

19                                            **II.**

20  **THE STATE COURT REASONABLY REJECTED PETITIONER'S
21  CLAIM THAT HIS SENTENCE CONSTITUTED CRUEL AND
    UNUSUAL PUNISHMENT**

22          Petitioner contends that his sentence of 15 years to life for two counts of residential

23  robbery with a gang enhancement constitutes cruel and unusual punishment.  The state court

24  reasonably rejected his claim.

---

26
27      6.  The *Romero* court interpreted California Penal Code section 186.22(b)(1), which is
    identical to section 186.22(b)(4), at issue here, in all pertinent respects.  The only difference between
    the subdivisions is the punishment proscribed for the crimes at issue.
28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
WHA (PR)

**A.    State Court Of Appeal's Ruling**

The state court rejected petitioner's claim as follows:

The probation report states that Edmond has eight misdemeanor convictions, one of which was for inflicting corporal injury on a cohabitant and two of which were for battery. Edmond was granted three years probation on September 4, 2003, on two of the misdemeanor convictions, and granted three years probation on November 24, 2003, on three of the other misdemeanor convictions. Both probations were revoked on March 8, 2004, and bench warrants issued, due to Edmond's failure to comply with his probation conditions. The current offenses occurred on March 22, 2004. The probation officer in this case found Edmond eligible for a grant of probation but recommended that probation be denied, as unfavorable criteria affecting the grant of probation predominate, and that Edmond be sentenced to consecutive 15-year-to-life terms pursuant to section 186.22, subdivision (b)(4). At the sentencing hearing, when the court asked Edmond's counsel if he wanted "to be heard on the record about the recommendation" of the probation department, counsel responded, "Submitted, Your Honor." The court denied probation and sentenced Edmond to concurrent terms of 15 years to life.

Edmond, joined by Edwin, now contends that his sentence of 15 years to life for the two home invasion robberies for the benefit of or in association with a criminal street gang constitutes cruel and/or unusual punishment under the state and federal Constitutions. Edmond argues that the sentence is grossly disproportionate to the nature of the offense and the offender and is the same sentence that is imposed on those convicted of second degree murder. (See § 190, subd. (a).) "The standard gang enhancement for a violent felony is now 10 years. If not for the disproportionate life sentence provided for by [section 186.22, subdivision (b)(4), Edmond] could have been sentenced to a determinate term of 19 years. That would have been a more appropriate sentence for a 26-year-old man with no prior felony convictions." He also argues that his counsel rendered ineffective assistance by failing to object at the sentencing hearing to Edmond's 15-year-to-life sentence on cruel and/or unusual punishment grounds and by failing to argue that there were several mitigating factors in Edmond's favor.

" ' "The Legislature is . . . accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." ' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).) "Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court. Here, the matter was not raised below, and is therefore waived on appeal. [Citation.]" (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.) Although counsel failed to raise a claim of cruel and/or unusual punishment at sentencing, we will consider the issue due to Edmond's claim of ineffective assistance of counsel. (*Ibid.*; *People v. Martin* (1995) 32 Cal.App.4th 656, 661, disapproved on another point in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.)

"A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 440.) Here, even assuming that a reasonably competent attorney would have raised the issue of cruel and/or unusual punishment in the trial court, Edmond has not shown prejudice from his counsel's failure to do so.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327 WHA (PR)

1g        Since the California Constitution's prohibition against cruel or unusual punishment
is arguably broader than the United States Constitution's prohibition against cruel and
2    unusual punishment, we analyze Edmond's contention under the California standard only.
A punishment that satisfies this standard necessarily also satisfies the federal standard.
3    (Cf. *People v. Anderson* (1972) 6 Cal.3d 628; *People v. Hill* (1992) 3 Cal.4th 959,
1013-1014.)    The California Constitution's proscription against cruel or unusual
4    punishment is violated when a penalty is "so disproportionate to the crime for which it is
inflicted that it shocks the conscience and offends fundamental notions of human dignity."
5    (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted (*Lynch*).) "Whether a particular
punishment is disproportionate to the offense is, of course, a question of degree. The
6    choice of fitting and proper penalties is not an exact science, but a legislative skill
involving an appraisal of the evils to be corrected, the weighing of practical alternatives,
7    consideration of relevant policy factors, and responsiveness to the public will; in
appropriate cases, some leeway for experimentation may also be permissible. The
8    judiciary, accordingly, should not interfere in this process unless a statute prescribes a
penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the
9    crime as to violate the prohibition against cruel or unusual punishment." (*Id.* at pp.
423-424.) "Only in the rarest of cases could a court declare that the length of a sentence
10   mandated by the Legislature is unconstitutionally excessive. [Citations.]" (*People v.
Martinez* (1999) 76 Cal.App.4th 489, 494.)

11

12        Section 186.22, subdivision (b)(4), which is part of the Street Terrorism Enforcement
and Prevention Act (STEP Act), prescribes the punishment for a home invasion robbery
13   committed in association with or for the benefit of a street gang at 15 years to life. The
Attorney General argues that such a sentence is consistent with the purpose of the STEP
14   Act. "Underlying the STEP Act was the Legislature's recognition that 'California is in
a state of crisis which has been caused by violent street gangs whose members threaten,
15   terrorize, and commit a multitude of crimes against the peaceful citizens of their
neighborhoods.' [Citation.] The act's express purpose was 'to seek the eradication of
     criminal activity by street gangs.' [Citation.]" (*Gardeley, supra*, 14 Cal.4th at p. 609.)
16

17        A defendant bears the burden of establishing that the punishment prescribed for his
offense is unconstitutional. (*People v. Wingo* (1975) 14 Cal.3d 169, 174; *People v. King*
18   (1993) 16 Cal.App.4th 567, 572.) The California Supreme Court in *Lynch* "identified
three techniques used by the courts to focus the inquiry: (1) an examination of the 'nature
19   of the offense and/or the offender, with particular regard to the degree of danger both
present to society'; (2) a comparison of the challenged penalty with those imposed in the
20   same jurisdiction for more serious crimes; and (3) a comparison of the challenged penalty
with those imposed for the same offense in different jurisdictions." (*In re Reed* (1983) 33
21   Cal.3d 914, 923, overruled on another point in *In re Alva* (2004) 33 Cal.4th 254, 292.)
In making the inquiry as to the first factor, courts must consider the "totality of the
22   circumstances" surrounding the commission of the crime, "including such factors as its
motive, the way it was committed, the extent of the defendant's involvement, and the
     consequences of his acts." (*Dillon, supra*, 34 Cal.3d at p. 479.)
23

24        Here Edmond has eight misdemeanor convictions, including three convictions for
violent conduct. He was granted probation twice, and both times he failed to comply with
25   his probation conditions. He committed the current offenses after his probation had been
revoked and bench warrants had issued. Defendant focuses on the fact that the offenses
26   occurred while he and his codefendants were under the influence of methamphetamine,
and that he attended drug treatment programs during his pretrial incarceration. "However,
27   drug addiction is not necessarily regarded as a mitigating factor when a criminal defendant
has a long-term problem and seems unwilling to pursue treatment. (Compare *People v.
28   Simpson* (1979) 90 Cal.App.3d 919, 926-928 . . . with *People v. Regalado* (1980) 108

1g Cal.App.3d 531, 588-540 . . . and *People v. Reyes* (1987) 195 Cal.App.3d 957, 960-964,
 . . . and cases there cited.)" (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1511.)

2

3  Edmond acknowledges that home invasion robbery is a serious offense, but maintains
that his counsel was ineffective at sentencing because he failed to argue several mitigating
factors in Edmond's favor:  he was under the influence of methamphetamine at the time
4 of the offenses; he was relatively young (26) at the time of sentencing; he did not have any
prior felony convictions; and he acknowledged shortly after the offenses were committed
5 going to Newell's and Riddell's apartment that morning.  While the probation report
reported all of these factors, it did not consider them mitigating factors.  Even if counsel
6 had raised these claims below, and the trial court agreed with them, the factors in
aggravation still predominated: Edmond had eight prior misdemeanor convictions; he was
7 on probation at the time of the current offenses; his performance on probation was
unsatisfactory; the recent offenses for which he was on probation involved violence; the
8 victims in this case were particularly vulnerable; the offenses involved violence; and the
offenses involved some planning.  On appeal, Edmond does not contest these aggravating
9 factors.

10  Edmond contends that his sentence of 15 years to life is also disproportionate
because his sentence is the same as that imposed on a defendant convicted of second
11 degree murder.  "It is disproportionate that [he] would receive the same sentence as
someone who commits an unpremeditated murder.  Likewise, [his] minimum parole
12 eligibility period of 15 years is longer than the maximum sentence (11 years) for
voluntary manslaughter."  Neither of these comparisons supports a conclusion that
13 Edmond's sentence is unconstitutionally disproportionate. The severity of injury inflicted
is not the only measure of the gravity of offenses; the fact that Edmond may have received
14 a more severe sentence than a violent offender who did not commit the offense for the
benefit of or in association with a criminal street gang does not prove Edmond's sentence
15 is disproportionate. (Cf. *People v. Cooper* (1996) 43 Cal.App.4th 815, 826; *People v.
Ingram* (1995) 40 Cal.App.4th 1397, 1416, disapproved on other grounds in *People v.
16 Dotson* (1997) 16 Cal.4th 547, 560.)

17  In light of the above, we conclude that the punishment imposed, 15 years to life, was
not constitutionally infirm and that there is no reasonable probability that the trial court
18 would have concluded otherwise had Edmond's counsel argued his cruel and/or unusual
punishment claim below.  Accordingly, Edmond's claim of ineffective assistance of
19 counsel is rejected. (*People v. Price, supra*, 1 Cal.4th at p. 440.)

20 Exh. H at 30-35.

21 **B. The State Court's Rejection Of Petitioner's Claim Was Reasonable**

22  As an initial matter, the state court found that petitioner's cruel and unusual punishment

23 claim was barred because he did not raise it in the trial court.  Claims that were not properly raised

24 in the trial court are procedurally defaulted and may not be considered on federal habeas corpus

25 absent a showing of cause for the default and prejudice as a result. *Bonin v. Calderon*, 59 F.3d 815,

26 842-843 (9th Cir. 1995); *see Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004) (claim was

27 procedurally defaulted where no constitutional objection was raised at trial).

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
WHA (PR)

1g    On appeal, petitioner argued that his trial counsel was ineffective for failing to raise the

2    claim.  The state court considered petitioner's claim of ineffective assistance of counsel.  Finding

3    no merit to the underlying claim, the court found no merit to petitioner's claim of ineffective

4    assistance of counsel.  Exh. H at 35.  Petitioner does not raise the ineffective assistance of counsel

5    claim in his federal petition.  Instead, he simply reiterates his cruel and unusual punishment claim,

6    and does not acknowledge his failure to properly preserve the claim in state court.  Since petitioner

7    fails to show cause for his procedural default and fails to show he was prejudiced as a result, his

8    claim should not be considered on federal habeas corpus.  In any event, petitioner's claim fails on

9    the merits.

10    In *Lockyer v. Andrade*, 538 U.S. 63 (2003), the Supreme Court held that the court's

11    threshold task under 28 U.S.C. § 2254(d)(1) is to determine what constitutes "clearly established

12    Federal law, as determined by the Supreme Court of the United States."  *Id*. at 71.  The court

13    acknowledged that its previous Eighth Amendment opinions had "not been a model a clarity," and

14    had "not established a clear or consistent path for courts to follow."  *Id*. at 72.  The court held that

15    the only relevant clearly established Supreme Court law in this area is that a "gross

16    disproportionality principle is applicable to sentences for terms of years."  *Id*.; *accord*, *Ewing v.*

17    *California*, 538 U.S. 11, 23 (2003).

18    Legislatures have "broad discretion to fashion a sentence that fits within the scope of the

19    proportionality principle."  *Andrade* at 76.  While the precise contours of this principle are

20    "unclear," it is applicable "only in the 'exceedingly rare' and 'extreme' case."  *Id*. at 72-73, quoting

21    *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring).

22    The Supreme Court concluded that the state court's affirmance of Andrade's sentence of

23    50 years to life, which was based on two current convictions for felony petty theft of videotapes with

24    a prior, plus three prior convictions for residential burglary, was not an unreasonable application of

25    the gross disproportionality principle.  *Andrade* at 73-74.  That sentence fell between the facts in

26    *Rummel v. Estelle*, 445 U.S. 263 (1980), and *Solem v. Helm*, 463 U.S. 277 (1983).  *Andrade* at 74.

27    In *Rummel,* the court upheld a sentence of life in prison with the possibility of parole for three non-

28

1 violent theft-related felonies.  In *Solem,* the court reversed a sentence of life without possibility of

2 parole for passing a bad check along with six prior non-violent felonies, but acknowledged that

3 *Rummel* would apply "in a similar factual situation."  *See Andrade* at 74.   In *Ewing*, the court

4 upheld on direct appeal a sentence of 25 years to life for the current offense of felony grand theft of

5 three golf clubs with a prior conviction, where the defendant had suffered three prior convictions

6 for residential burglary and one for robbery.

7         The Supreme Court held in *Andrade* that because the scope of the Eighth Amendment as

8 applied to non-capital cases was so imprecisely defined, it was not objectively unreasonable for the

9 state court to conclude that Andrade's sentence fit within those broad parameters.  *Id*. at 76; *see*

10 *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("Applying a general standard to a specific case

11 can demand a substantial element of judgment.  As a result, evaluating whether a rule application

12 was unreasonable requires considering the rule's specificity.  The more general the rule, the more

13 leeway courts have in reaching outcomes in case by case determinations."); *Mitchell v. Esparza*, 540

14 U.S. 12, 17 (2003) ("A federal court may not overrule a state court for simply holding a view

15 different from its own, when the precedent from this Court is, at best, ambiguous.").

16         The only question before this Court is whether the state court's decision upholding

17 petitioner's sentence of 15 years to life was an unreasonable application of the gross

18 disproportionality principle as explained by the Supreme Court.  Habeas relief may not be premised

19 on circuit authority.  *Sims v. Rowland,* 414 F.3d 1148, 1151 (9th Cir. 2005) ("reference to Ninth

20 Circuit precedent cannot be used to circumvent the requirement that, in order to grant the writ, we

21 must be persuaded that the state court's decision is contrary to clearly established Supreme Court

22 precedent").

23         Here, the state court found that petitioner's sentence did not violate the disproportionality

24 principle.  It noted that petitioner had eight misdemeanor convictions, including three convictions

25 for violent conduct.  He was twice granted probation, and both times failed to comply with his

26 probation conditions.  He committed the current offenses after his probation had been revoked and

27 bench warrants had issued.  The state court discounted petitioner's claim that he was under the

28

influence of methamphetamine at the time of the crimes, finding that it was not a mitigating factor when a criminal defendant has a long-term problem that he has failed to address. The state court further noted that petitioner had acknowledged home invasion was a serious offense. It considered his proffered mitigating circumstances, but found they were not in fact mitigating, and that the aggravating circumstances predominated. Among the aggravating factors were petitioner's prior convictions, his failure on probation, the violence involved in the current offenses, the vulnerability of the victims, and that the offenses involved planning, none of which petitioner disputed. The court rejected petitioner's claim of disproportionality, noting that he committed his offenses for the benefit of or in association with a criminal street gang, rendering his case dissimilar to a defendant who had not committed such a crime.

Nothing in this record suggests the state court failed to consider the appropriate principles, or that it applied those principles unreasonably. Rather, the state court carefully considered petitioner's claim of disproportionality, but found it unsupported on the facts of this case. Because the state court's rejection of petitioner's claim was reasonable, it should be denied.

## III.

**THE STATE COURT REASONABLY REJECTED PETITIONER'S CLAIM THAT THE TRIAL COURT FAILED TO ADEQUATELY INSTRUCT THE JURY**

Petitioner contends the trial court failed to instruct the jury with respect to the gang enhancement allegation that, "A crime is committed in association with a criminal street gang when there is a relationship between the crime and the gang." The state court reasonably rejected his claim.

The trial court instructed the jury with CALJIC No. 17.24.2, which set out the findings required for the gang allegation. CT 506-508; RT 1115-1117. The instruction defines the meaning of a number of phrases, but does not define the term "in association with." Avery Darbey submitted several proposed jury instructions. Aug. CT 1-13. None of them defined the term "in association with." Edwin and petitioner also did not request an instruction defining the term. Aug. CT 14-22. On appeal, Darbey, in a supplemental brief, argued the trial court should have defined the term "in

1g association with" sua sponte.  Exh. D.  Petitioner joined in that argument.  Exh. F at 2.  He also

2 joined in the argument when Darbey raised it in his Petition for Review.  Exh. I at 4.

### A.    State Court Of Appeal's Ruling

The state court rejected petitioner's claim as follows:

As stated above, the court instructed the jury with CALJIC No. 17.24.2 that "the essential elements" of the criminal street gang allegation "are:  [¶] 1. The crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang; and [¶] 2. These crimes were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members."  The court further instructed that "[t]he Criminal Street Gang Statute, Penal Code Section 186.22(b), does not criminalize mere gang membership."  All three defendants submitted additional proposed jury instructions to the court, but none of the proposed instructions defined the term "in association with a criminal street gang."  However, Avery now contends that the court erred in failing to instruct the jury sua sponte that "'A crime is committed in association with a criminal street gang when there is a relationship between the crime and the gang.'" He argues that by failing to so instruct, the court failed to properly define an element of the enhancement.  We reject this contention as we have found no authority to support Avery's underlying premise that "a crime is committed in association with a criminal street gang when there is a relationship between the crime and the gang."

Avery cites *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), in support of his claim.  In that case, our Supreme Court stated:  "[T]he phrase 'for the benefit of, at the direction of, or in association with,' . . . appears in subdivision (b)(1) of section 186.22.  The . . . provision states that, under certain conditions, a felony conviction qualifies as a street gang crime and hence is subject to increased punishment.  By inserting the italicized phrase in subdivision (b)(1), the Legislature made it clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is 'gang related,' that is, it must have been committed, in the words of the statute, 'for the benefit of, at the direction of, or in association with' a street gang."  (*Id*. at p. 622, fn. omitted.)  The court later stated:  "[T]he STEP Act does not punish a defendant for the actions of associates; rather the act increases the punishment for a defendant who committed a felony to aid and abet criminal conduct of a group that has as a primary function the commission of specified criminal acts and whose members have actually committed specified crimes, and who acted with the specific intent to do so." (*Id*. at p. 624, fn. 10.)

*Gardeley* does not stand for the proposition that "a crime is committed in association with a criminal street gang when there is a relationship between the crime and the gang." Rather, *Gardeley* simply held that a defendant is subject to increased punishment pursuant to section 186.22, subdivision (b), when he or she commits a crime that is "gang-related," that is when the crime is committed "for the benefit of, at the direction of, or in association with" a criminal street gang.  This is how the trial court instructed the jury in this case.  Accordingly, we cannot say that the court erred in failing to properly define an element of the enhancement by failing to give the instruction Avery now claims it was required to give sua sponte.

Exh. H at 20-21.

### B.    The State Court's Rejection Of Petitioner's Claim Was Reasonable

As noted above, federal courts are bound by state court interpretations of state law.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
WHA (PR)

1     *Estelle v. McGuire*, 502 U.S. at 67-68; *Wainwright v. Goode*, 464 U.S. at 84. The state court's

2 determination of what constitutes an element of an offense "is not open to challenge on habeas

3 review." *Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998). Here, the state court concluded that

4 petitioner's claim was not supported by state law. The jury had been given the applicable

5 instruction, CALJIC No. 17.24.2, which fully defined the enhancement at issue and the findings the

6 jury was required to make. Neither petitioner nor any other defendant suggested the instruction was

7 inadequate. The jury expressed no confusion regarding the term, "in association with." Moreover,

8 the instruction given properly encompassed each of the ways in which a crime could be "gang

9 related," rather than focusing on one, as petitioner suggests. As the state court found, the instruction

10 petitioner contends should have been given did not accurately state the law. In these circumstances,

11 the state court reasonably rejected his claim.

12        Even if the trial court should have defined "in association with" sua sponte, petitioner still

13 could not prevail. An instruction allegedly incorrect under state law is not a basis for federal habeas

14 relief. *Estelle v. McGuire*, 502 U.S. at 71-72. "[N]ot every ambiguity, inconsistency, or deficiency

15 in a jury instruction rises to the level of a due process violation. The question is '"whether the ailing

16 instruction … so infected the entire trial that the resulting conviction violates due process."'

17 [Citation.] '"A single instruction to a jury may not be judged in artificial isolation, but must be

18 viewed in the context of the overall charge."' [Citation.] If the charge as a whole is ambiguous, the

19 question is whether there is a '"reasonable likelihood that the jury has applied the challenged

20 instruction in a way" that violates the Constitution.'" *Middleton v. McNeil*, 541 U.S. 433, 437

21 (2004); *see Estelle v. McGuire*, 502 U.S. at 72; *Boyde v. California*, 494 U.S. 370, 380 (1990). In

22 addressing this question, courts should not engage in speculation. "Jurors do not sit in solitary

23 isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers

24 might. Differences among them in interpretation of instructions may be thrashed out in the

25 deliberative process, with commonsense understanding of the instructions in the light of all that has

26 taken place at the trial likely to prevail over technical hairsplitting." *Boyde v. California*, 494 U.S.

27 at 380-381. Even if the reviewing court finds a reasonable likelihood that the jury misunderstood

28

1g  the instructions, petitioner must show the error had a substantial and injurious effect or influence in

2   determining the jury's verdict.  *Fry v. Pliler*, 127 S.Ct. at 2325, 2328; *see Brecht v. Abrahamson*,

3   507 U.S. at 637.

4        As noted, the jury expressed no confusion regarding the term "in association with."  None

5   of the defendants at trial believed the term required further definition, and none of them requested

6   additional clarifying language.  The term has a plain, unambiguous meaning, rather than a technical

7   meaning peculiar to the law.  In this context, it simply meant committing a crime with fellow gang

8   members.  *See People v. Morales*, 112 Cal.App.4th 1176, 1198 (2003) ("jury could reasonably infer

9   the requisite association from the very fact that defendant committed the charged crimes in

10  association with fellow gang members").  Petitioner admitted his gang membership.  He committed

11  the crime with two other admitted gang members.  The victims knew the perpetrators were gang

12  members and reported the crime as having been committed by gang members.  The evidence further

13  showed the crime was committed in retaliation for an earlier altercation between one of the victims

14  and Darbey, who had been beaten.  As the gang expert testified, petitioner's gang had to retaliate

15  to save face and ensure their reputation in the community.  The robberies also benefitted the gang

16  by helping to support it financially.  In short, the evidence overwhelmingly established that the

17  crimes were "gang-related."  In these circumstances, petitioner cannot show a reasonable likelihood

18  that the jury would have misunderstood the meaning of "in association with," nor can he show that

19  any error had a substantial and injurious effect or influence in determining the jury's verdict.

20  Accordingly, his claim must be rejected.

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated, respondent respectfully requests that the petition for writ of habeas corpus be denied.

Dated:  December 5, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

PEGGY S. RUFFRA
Supervising Deputy Attorney General


/s/ Joan Killeen
JOAN KILLEEN
Deputy Attorney General

Attorneys for Respondent

1g

**TABLE OF CONTENTS**

2

**Page**

3  STATEMENT OF THE CASE                                                          1

4  STATEMENT OF FACTS                                                             2

5  STANDARD FOR GRANTING RELIEF                                                   8

6  ARGUMENT                                                                       8

7     I.    THE    STATE    COURT    REASONABLY    REJECTED
            PETITIONER'S CLAIM THAT THERE WAS INSUFFICIENT
8           EVIDENCE TO SUPPORT THE GANG ENHANCEMENT                              8

9           A.   State Court Of Appeal's Ruling                                   8

10          B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable  10

11    II.   THE    STATE    COURT    REASONABLY    REJECTED
            PETITIONER'S   CLAIM   THAT   HIS   SENTENCE
12          CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT                             13

13          A.   State Court Of Appeal's Ruling                                  14

14          B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable  16

15    III.  THE    STATE    COURT    REASONABLY    REJECTED
            PETITIONER'S CLAIM THAT THE TRIAL COURT FAILED
16          TO ADEQUATELY INSTRUCT THE JURY                                      19

17          A.   State Court Of Appeal's Ruling                                  20

18          B.   The State Court's Rejection Of Petitioner's Claim Was Reasonable  20

19  CONCLUSION                                                                   23

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - C 07-4327
WHA (PR)

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Bonin v. Calderon*
59 F.3d 815 (9th Cir. 1995)                                16

*Bowen v. Roe*
188 F.3d 1157 (9th Cir. 1999)                               2

*Boyde v. California*
494 U.S. 370 (1990)                                        21

*Brecht v. Abrahamson*
507 U.S. 619 (1993)                                      8, 22

*Davis v. Woodford*
384 F.3d 628 (9th Cir. 2004)                               16

*Estelle v. McGuire*
502 U.S. 62 (1991)                                     13, 21

*Ewing v. California*
538 U.S. 11 (2003)                                         17

*Fry v. Pliler*
___ U.S. ___
127 S.Ct. 2321 (2007)                                    8, 22

*Garcia v. Carey*
395 F.3d 1099 (9th Cir. 2005)                              12

*Harmelin v. Michigan*
501 U.S. 957 (1991)                                        17

*Jackson v. Virginia*
443 U.S. 307 (1979)                                        11

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                              11

*LaMere v. Slaughter*
458 F.3d 878 (9th Cir. 2006)                               11

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                     17, 18

*Middleton v. McNeil*
541 U.S. 433 (2004)                                        21

*Miller-El v. Cockrell*
537 U.S. 322 (2003)                                         8

**TABLE OF AUTHORITIES**  **(continued)**

**Page**

*Mitchell v. Esparza*
540 U.S. 12 (2003)                                                      18

*Payne v. Borg*
982 F2d 335 (9th Cir. 1992)                                        10, 11

*People v. Gardeley*
14 Cal.4th 605 (1996)                                                   13

*People v. Morales*
112 Cal.App.4th 1176 (2003)                                          22

*People v. Romero*
140 Cal.App.4th 15 (2006)                                             13

*Rummel v. Estelle*
445 U.S. 263 (1980)                                                     17

*Sims v. Rowland*
414 F.3d 1148 (9th Cir. 2005)                                         18

*Solem v. Helm*
463 U.S. 277 (1983)                                                     17

*Stanton v. Benzler*
146 F.3d 726 (9th Cir. 1998)                                          21

*Wainwright v. Goode*
464 U.S. 78 (1983)                                                 13, 21

*Walters v. Maass*
45 F.3d 1355 (9th Cir. 1995)                                          11

*Williams v. Taylor*
529 U.S. 362 (2000)                                                  8, 11

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                       8

*Yarborough v. Alvarado*
541 U.S. 652 (2004)                                                     18

**Constitutional Provisions**

United States Constitution
     Eighth Amendment                                       17, 18

## TABLE OF AUTHORITIES  (continued)

1g

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

**Statutes**

28 United States Code
§ 2244(d)(1)                                                                                  2
§ 2254(d)(1)                                                                            8, 17
§ 2254(d)(2)                                                                                  8

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)          8

California Penal Code
§ 186.22(b)(1)                                                                              13
§ 186.22(b)(4)                                                                      2, 8, 13
§ 213(a)(1)(A)                                                                                1

**Other Authorities**

California Jury Instructions, Criminal
No. 17.24.2                                                                              19, 21